UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

UNITED STATES OF AMERICA                                                                    PLAINTIFF

v.                                                                        Criminal Action No. 3:19-CR-158-JRW

RANDY T. DEWITT                                                                              DEFENDANT

## ORDER AND MEMORANDUM OPINION

Defendant Randy Dewitt moves to reconsider the detention order of Magistrate Judge Colin Lindsay under 28 U.S.C. § 636(b)(1)(A). DN 49. This Court **DENIES** that motion.

\*     \*     \*

By Randy Dewitt's own admission, he has been spent so much time in the Nelson County Jail that, when it comes to the people who work there, he "know[s] all of them."[1] One of his more recent arrests occurred in April 2019, for drug-related offenses. Then in August 2019, while Dewitt was out on bond, Nelson County Sheriff's Deputies found illegal drugs and a whizzinator in Dewitt's home.

In August 2019, a federal grand jury indicted Dewitt on five counts related to the April incident:[2] possession with intent to distribute heroin;[3] possession of a firearm in furtherance of a drug trafficking crime;[4] possession with intent to distribute fentanyl;[5] possession with intent to

---

[1] DN 38 at 60.
[2] DN 1.
[3] 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C).
[4] 18 U.S.C. § 924(c)(1)(A)(i).
[5] 21 U.S.C. §§ 841(a)(2), 841(b)(1)(C).

1

distribute methamphetamine;[6] and possession with intent to distribute methamphetamine on the premises where children are present or reside.[7]

The Government argued that pre-trial detention was presumed because probable cause existed to believe Dewitt had: 1) committed crimes punishable by at least ten years in prison; 2) possessed a firearm in furtherance of drug dealing; and 3) committed a crime involving a child victim.[8] Judge Lindsay concluded that Dewitt had failed to introduce sufficient evidence to rebut that presumption.[9] Based on that failure, on Dewitt's criminal history, and on Dewitt's inability to propose a residence for home detention other than the home of someone who had been convicted for drug dealing, Judge Lindsay ordered Dewitt detained pending trial.[10]

Several months later, in October 2019, Dewitt moved to revoke Magistrate Judge Lindsay's detention order.[11] District Judge Joseph McKinley denied that motion.[12] He agreed with Judge Lindsay's "determination that the Defendant did not produce sufficient evidence to rebut the presumption that no condition or combination of conditions will reasonably assure the safety of the community if the Defendant were released."[13]

In March 2020, after the outbreak of COVID-19, Dewitt moved for release again.[14] This Court referred the motion to Magistrate Judge Lindsay.[15] He denied the motion.[16] Dewitt then

---

[6] 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C).
[7] 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 860a.
[8] 18 U.S.C. § 3142(e)(3). Dewitt disputed whether Count 5 referred to child victims, and it was (and is) unnecessary to decide that question.
[9] DN 15.
[10] *Id.*
[11] DN 16.
[12] DN 19.
[13] *Id.*
[14] DN 41.
[15] DN 42.
[16] DN 48.

moved for reconsideration by this Court.[17] That makes this the fourth round of adjudication on the question of whether this defendant, whose detention is statutorily presumed, should be released – despite the absence of *any* evidence distinguishing this case from every other case where the presumption of detention is utterly unrebutted.

In the two most recent rounds of motions, Dewitt argues that the COVID-19 pandemic requires his release. But as other judges in this District and many across the country have repeatedly held, no defendant is entitled to release "based solely on generalized COVID-19 fears and speculation."[18] Instead, under 18 U.S.C. §§ 3142(f)(2), 3142(g), and 3142(i), courts should make a specific determination for each defendant based on (1) the original grounds for detention, (2) the specificity of the defendant's concerns, (3) the details of his proposed plan for release, and (4) the likelihood of increasing COVID-19's risk to others.[19]

---

[17] DN 49.

[18] *United States v. Shelton*, No. 3:19-CR-14-RGJ, 2020 WL 1815941, at *4 (W.D.Ky. Apr. 9, 2020) (quoting *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020)). Scores of other district court opinions have also cited *Clark*. *See* Westlaw Search (Apr. 20, 2020). The vast majority have denied motions for release. *See, e.g.*, *United States v. Veras*, 3:19-CR-010, 2020 WL 1675975 (M.D. Pa. Apr. 6, 2020); *United States v. McDonald*, No. 2:19-cr-00312-KJD-VCF, 2020 WL 1659937 (D. Nev. Apr. 3, 2020). Of the minority that have granted such motions, nearly all of them have involved defendants with health conditions that made them unusually at risk. *See, e.g.*, *United States. v. Garcha*, No. 19-cr-00663-EJD-1 (VKD), 2020 WL 1593942 (N.D. Cal. Apr. 1, 2020) (defendant with lung damage and compromised immune system); *United States v. Hernandez*, 19 Cr. 169 (VM), 2020 WL 1503106 (S.D.N.Y. Mar. 30, 2020) (sixty-four year-old defendant with asthma and high blood pressure). That is not to say that every defendant with a health condition should be released. *See, e.g.*, *United States v. Deutsch*, No. 18-cr-00502 (FB), 2020 WL 1694358 (E.D.N.Y. Apr. 7, 2020) (pre-diabetes, no release); *United States v. Pate*, No. 8:17-cr-00236-PWG-1, 2020 WL 1694368 (D. Md. Apr. 7, 2020) (asthma, no release); *United States v. Santana*, No. 1:19-CR-251, 2020 WL 1692010 (M.D. Pa. Apr. 7, 2020) (asthma, no release); *United States v. Thomas*, No. 19-176, 2020 WL 1599339 (W.D. Pa. Mar. 31, 2020) (bronchitis and colitis, no release). And to the extent a small number of additional district-court decisions have released young, healthy defendants, they are not typical, not binding, and not persuasive. *See, e.g.*, *United States v. Chandler*, No. 1:19-cr-867 (PAC), 2020 WL 1528120 (S.D.N.Y. Mar. 31, 2020).

[19] *Shelton*, 2020 WL 1815941, at *4 (quoting *Clark*, 2020 WL 1446895, at *3); *see also United States v. Stephenson*, No. 3:20-CR-18-CRS, 2020 WL 1811353, at *3 (W.D.Ky. Apr. 8, 2020) (the

Here, every factor points toward detention.

First, the original grounds for detention remain. As the Government's brief said, "Dewitt has not suddenly become less of a societal menace because of COVID19."[20] Moreover, Louisville's 242% rise in shootings during the current pandemic somewhat undermines Dewitt's ipse dixit that there's "a lower risk" of pre-trial detainees "violating supervision during a global pandemic during which even leaving the house can endanger lives."[21]

Second, none of Dewitt's concerns are specific to him. In fact, Dewitt's name is barely mentioned in the nine pages of his two COVID-19 motions.[22]

Third, Dewitt has proposed no workable plan for home incarceration. Recall, of course, that last time he was out on bond for dealing drugs, he was arrested for dealing more drugs.

And fourth, releasing Dewitt would increase the risk of spreading COVID-19, since it injects someone from one environment (jail) into a new environment (not jail). In other words, it would mean socially mixing when everyone else is socially distancing.

\*    \*    \*

---

court "must make a particularized finding of necessity" under 18 U.S.C. § 3142(i), which provides for temporary release for a compelling reason).

[20] DN 50 at 1; *see also Stephenson*, 2020 WL 1811353, at *2 ("While the global pandemic has added a new dimension to the overall evaluation judicial officers must make with respect to detention decisions, the court concludes, as did the magistrate judge, that these concerns about confinement do not materially bear on the determination of dangerousness.").

[21] DN 41 at 6; *see also* Kala Kachmar, *3 Things To Know About Louisville's Violent Crime Spree during the coronavirus pandemic*, COURIER JOURNAL, Apr. 19, 2020, https://www.courier-journal.com/story/news/2020/04/19/shootings-on-rise-louisville-amid-coronavirus/5162137002/ ("Since March 16, when the first coronavirus-related orders were put into place, there have been 46 shootings, 11 of which were fatal. During the same time period in 2019, those figures were 19 and seven, according to data from Game Changers, a Louisville nonprofit that tracks gun violence.").

[22] DN 41; DN 49.

Nothing in this opinion should obscure three obvious points. First, no one questions the severity of the current pandemic.[23] Second, jails should take precautions to protect detainees as much as possible, as Dewitt's jail has done.[24] Third, pandemic or no pandemic, many defendants awaiting trial should not be detained.[25]

But when a pretrial detainee is at the same risk from COVID-19 as the rest of the prison population, COVID-19 is no reason for release. Otherwise, federal courts would have to release more than 60,000 pretrial detainees.[26] That would be a recipe for violence[27] and mayhem.[28]

---

[23] *See In re Abbott*, No. 20-50264, 2020 WL 1685929, at *2 (5th Cir. Apr. 7, 2020) ("As all are painfully aware, our nation faces a public health emergency caused by the exponential spread of COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2.").

[24] DN 48 at 4 (Judge Lindsay's Order) ("The United States says that the Grayson County Jail, where defendant is being held, has implemented the following steps to counter the COVID-19 virus: (1) all employees and inmates are monitored for symptoms of respiratory infection; (2) all new inmates are screened by medical personnel for signs of respiratory infection and appropriate infection prevention practices are implemented; (3) visits by non-essential personnel are suspended; (4) inmate visitation is suspended; (5) attorney/client meets are being held by video conference or 'through the glass' meetings; (6) 'clean teams' have been designated and provided personal protective equipment and supplies to disinfect high traffic areas; (7) hand sanitizer stations have been established and remain fully stocked; and (8) symptomatic individuals will be isolated.") (citing DN 44, at Page ID #194).

[25] *See United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").

[26] U.S. Marshals Service, 2020 Facts & Figures, Feb. 25, 2020, https://www.usmarshals.gov/duties/factsheets/facts.pdf ("Total Average Daily Detention Population" is 61,489).

[27] In 2012, a Florida man named Joseph Williams was convicted of burglary. In 2018, he was convicted of being a felon in possession of a firearm. In March 2020, he was in pretrial detention on two charges. He'd been arrested on 35 charges in his life. But on March 19, he was released from jail because of the COVID-19 pandemic. And the next day, according to the authorities, he murdered a man. *See* Michael Levenson and Alan Yuhas, *Florida Inmate Released Amid Pandemic Killed Someone the Next Day, Officials Say*, N.Y. TIMES, Apr. 15, 2020, https://www.nytimes.com/2020/04/15/us/florida-inmate-coronavirus-murder.html; *see also* Brian Arradondo, *Sheriff: Drug suspect committed murder 1 day after being released from jail in coronavirus purge,* FOX 13 NEWS, April 15, 2020, https://www.fox29.com/news/sheriff-drug-suspect-committed-murder-1-day-after-being-released-from-jail-in-coronavirus-purge.

[28] *See, e.g.*, Scheherezade Faramarzi, *Saddam's Amnesty Blamed for Iraq's Crime*, ASSOCIATED PRESS, May 16, 2003 ("A few months before the war, Saddam Hussein freed some 100,000 prisoners, most of them hardened criminals. Now, with security tenuous across Iraq and Baghdad

_Justin R. Walker_
Justin R Walker, District Judge
United States District Court

4/20/2020

---

plagued by crime and fear, U.S. officials are blaming that general amnesty for much of the chaos. In interviews across the capital Friday with more than 30 Iraqis, many agreed. 'Security will not return to the country until all the prisoners return to jail,' said Khalil al-Baaj, a police lieutenant who said he was stalked by a freed killer. Even though Baghdad police have begun returning to work – and the U.S. Army sent in 2,000 military policemen – many of the 5 million residents of the capital are afraid to venture out at night. Reports stream in of kidnappings, rapes and carjackings."); *see also Department of Defense Appropriations for Fiscal Year 2004 Before the U.S. Senate, Subcommittee of the Committee on Appropriations* (2004) (Statement of Hon. Donald Rumsfeld, Sec'y of Def.) https://www.govinfo.gov/content/pkg/CHRG-108shrg2910443/html/CHRG-108shrg2910443.htm (Secretary Rumsfeld: "Number one, every jail in that country to my knowledge was emptied. So on the street are looters, hooligans, and bad people.").